Filed 9/29/15  In re Kendall J. CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re KENDALL J., a Person Coming Under the Juvenile Court Law. | B261167 (Los Angeles County Super. Ct. No. DK06983) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. KELSEY J. et al., Defendants and Appellants. | |

APPEAL from an order of the Superior Court of Los Angeles County, D. Zeke Zeidler, Judge.  Affirmed.

Denise M. Hippach, under appointment by the Court of Appeal, for Defendant and Appellant Kelsey J.

Emery El Habiby, under appointment by the Court of Appeal, for Defendant and Appellant Martin D.

Mark J. Saladino, County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Kimberly Roura, Deputy County Counsel, for Plaintiff and Respondent.

Kelsey J. (mother) and Martin D. (father) appeal from the juvenile court orders sustaining a Welfare and Institutions Code[1] section 300 petition finding jurisdiction over their infant daughter Kendall J., arguing the orders are not supported by substantial evidence. We affirm.

## BACKGROUND

Kendall J. was born in an Orange County hospital. When she was under three weeks old, on August 11, 2014, the Los Angeles Department of Children and Family Services (DCFS) received a child abuse and neglect referral reporting that mother smoked marijuana and took methadone. The reporter suspected that Kendall was still in the hospital because she was withdrawing from drugs mother used during her pregnancy. In March 2014, while mother was pregnant, the reporting party smelled marijuana in mother's room, and in April 2014 mother had tested positive for opiates.

A DCFS social worker went to the hospital the same day, and met with mother and a hospital social worker (HSW). The HSW had contacted Orange County child protection services, but no referral was made as mother lived in Los Angeles County. The HSW stated that mother had been forthcoming about her history of heroin use and had reported that she was receiving methadone treatment at Western Pacific Stanton Medical Center (Western Pacific), and had received prenatal care in Los Angeles County. When mother gave birth, she was on 88 mg of methadone daily which she had since decreased to 44 mg, and she was behaving appropriately with Kendall.

Mother told the social worker she had used heroin for two years, but stopped when she realized she was pregnant. Five months into the pregnancy, mother started a methadone program at various Western Pacific locations because she had been moving around. Her address was in Los Angeles, but she had gone into labor in Orange County while moving. Mother said she was on informal probation for a drug-related

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2

misdemeanor, but had not enrolled in a substance abuse program as required by her criminal court diversion program. She agreed to on-demand drug testing.

Mother identified Martin D. as Kendall's father. They were not together, he was not involved in the baby's life, and mother had unspecified "stipulations" before she would allow him to be involved. When the social worker expressed DCFS's concerns about her heroin use, new-found sobriety, and Kendall's infancy, mother agreed that the social worker detain Kendall and place the baby with mother's relatives.

Kendall was born at 36.5 weeks; she weighed five and a half pounds. She had respiratory problems at birth, required a face mask for oxygen, and was transported to neonatal intensive care. She tested positive for methadone and was given decreasing doses of the drug to wean her from dependence. Mother visited Kendall in the intensive care unit, stayed involved, and arranged for a pediatrician to manage Kendall's weaning off methadone on an outpatient basis.

Father told the social worker he could not meet with her given his work schedule. Father initially agreed to drug testing on demand, but he then became upset, said he had not signed the birth certificate and would not speak to the social worker or DCFS until a paternity test proved he was Kendall's father, and then hung up.

Both parents have criminal histories. Mother's record includes a June 2011 arrest for possession of a narcotic controlled substance, for which she received deferred judgment in drug court, although the criminal process was reinstated in late March 2014; an October 2013 arrest for possession of controlled substance paraphernalia and for a warrant for drug possession; and two arrests in July 2014 on a warrant for drug possession. Father has 2007 convictions for vandalism, obstructing a police officer, and disorderly conduct: intoxicated drug/alcohol and a 2007 arrest for selling marijuana.

In 2008 he was arrested for domestic violence battery and convicted of "fight/noise/offensive words." In 2009 father was twice convicted of driving under the influence (DUI), once while driving with a suspended license, and arrested again for DUI. In 2013, he was arrested for disorderly conduct: intoxicated drugs/alcohol and for a DUI warrant, and he pleaded to a loud/unreasonable noise infraction.

3

Mother's aunt and uncle agreed to care for Kendall. They were aware of mother's substance abuse and had reconnected with her two months earlier, when mother called to tell them she was pregnant and might have to serve jail time.

Mother tested positive for low levels of marijuana on August 13, 2014.

DCFS filed a petition on August 20, 2014, alleging under section 300, subdivision (b) that mother's past and present substance abuse placed newborn Kendall at risk. An addendum report recommended monitored visits for mother and father. DCFS telephoned father on August 19 to tell him the hearing was the next day, and he said he would not attend on such short notice. Father repeated that he would like a paternity test, and if he was Kendall's father, he would be willing to care for and supervise her with the help of his family.

Before the hearing on August 20, 2014, the HSW submitted a letter in support of mother's desire to have Kendall returned to her custody, as mother had been attentive in visiting Kendall in the ICU and was very involved in securing a pediatrician. Western Pacific verified that mother had been admitted to methadone maintenance treatment on June 9, 2014. Her case manager stated mother attended the clinic daily and was randomly tested four times a month, and she showed signs of improvement and willingness to remain free of illicit drugs. Mother had been in continuous methadone treatment since January 18, 2014, where all her tests for illicit drugs were negative.

Mother was present at the detention hearing. The trial court ordered that her address be kept confidential and deferred a paternity finding. As no services were in place to allow Kendall's release to mother, the court ordered Kendall placed temporarily with mother's aunt and uncle, ordered a paternity test for father, and ordered DCFS to refer both parents for weekly random and on demand drug testing. Mother had monitored visits, and the court gave DCFS discretion to release Kendall to mother in an inpatient program or in the home of her aunt and uncle. The court continued the detention hearing to August 29 for father's arraignment and DNA testing.

On August 19, at a team decision making meeting, mother agreed to enroll in a substance abuse program and in testing. She was attending Narcotics Anonymous (NA)

4

meetings but did not have a sponsor, and had not enrolled in any programs ordered by criminal court. Mother had no stable residence. The maternal grandmother (MGM) had removed a prior restraining order against mother (according to mother, obtained because MGM "wanted her out of the home"), and mother planned to return to MGM's home. Mother adamantly denied using marijuana, although she could not explain her positive test on August 14. A letter from Valley Family Center confirmed that mother had enrolled in a parenting program. In a last minute information filed August 29, the social worker reported that mother visited Kendall daily, but had not followed through on referrals to begin a program. DCFS did not recommend release to mother until she showed a commitment to sobriety by enrolling in a program and testing, as Kendall was a fragile newborn. Father did not want visits until the DNA results were final.

At the continued detention hearing on August 29, mother was present. Father appeared, checked in with the bailiff, reported for DNA testing, and did not return to the courtroom for arraignment and appointment of counsel. The trial court continued father's arraignment to October 6, and over the objection of DCFS, ordered that mother may reside in the caretakers' (maternal aunt and uncle) home once she tested clean, attended NA meetings, and actively worked toward enrollment in a program. She was not to be left alone with Kendall, but DCFS had discretion to release Kendall to mother in the interim.

**Amended petition**

On October 6, DCFS filed an amended petition, adding two allegations against father under section 300, subdivision (b). The first alleged father had unresolved issues and a history of alcohol abuse, citing his two DUI convictions in 2009. Father had failed to test for DCFS, and his "use and abuse" of alcohol endangered Kendall. The second alleged that father had a history of violent altercations, including a 1998 conviction for infliction of corporal injury on a spouse, also endangering Kendall. The DNA test results showed father was Kendall's biological father.

In an interview on September 10, mother had stated she was sober except for the prescribed methadone, and "'I don't use anymore.'" Kendall was almost off methadone.

5

Mother stopped using heroin when she realized she was pregnant, and had taken methadone at the advice of a physician, who warned her that without it her withdrawal symptoms could threaten the loss of the baby. Mother had called around, and no one would let her detox while she was pregnant. Mother had requested a retest of the August 14 positive marijuana test because she had not had any marijuana. She went to NA meetings and had a sponsor. She previously had a warrant for not attending a drug program, and did not go to court to clear it up because she was afraid she might get arrested, go into withdrawal, and affect her pregnancy. When she did go to court she was arrested on her way there, and served two weeks in jail.

Mother had known father for six years. They had used drugs together. "'He used meth for at least the last two years. He drinks and smokes weed.'" Father had anger issues, and was very aggressive and paranoid, believing someone was poisoning his hygiene products and people were breaking into his place and moving things. Father claimed he couldn't come to court because of his job but he didn't have one; he had been her boss, and had lost his job. Just a few months ago, father went to a mental health facility and told mother he was diagnosed as schizophrenic. She had only seen him three times since she got pregnant. Mother wanted him in Kendall's life "'if he gets his act together.'" Mother believed she could care for Kendall, and had arranged to be in an inpatient program that would provide supervision and support. Pregnancy had changed her, and she would do "anything and everything" to raise Kendall properly.

Mother's aunt reported that mother could physically care for Kendall. Mother had started using marijuana at around 13, but now was trying to make better choices and decisions, and "'Kendall will be safe here if given to [mother].'"

After many unreturned calls to father, the dependency investigator finally reached him on September 26, and set an appointment for father to come to the DCFS office for an interview on September 29. Father did not show up, did not call to cancel, and had not returned other calls.

DCFS reported that mother had the support of her relatives, who were willing to care for Kendall; had been proactive in entering treatment and complying with DCFS;

6

was dedicated to having Kendall in her care; had been testing clean; and was off methadone as of October 2.

Father appeared in court on October 6 and received appointment of counsel. The court dismissed the original petition, found father was Kendall's biological father, ordered Kendall to remain with mother's aunt, and gave DCFS discretion to release to father.

A prerelease investigation report filed October 21 stated that mother and father each requested Kendall be placed in their respective homes. Mother had complied with the court orders and had been with Kendall "24/7," had tested negative for illicit drugs, had begun parenting classes, and had enrolled in individual counseling. Father had seen Kendall only twice at the hospital, had not made any efforts to visit the baby, had failed to return phone calls, and had ignored information left on his voicemail regarding drug testing. Father said DCFS was harassing him, and he did not want Kendall to be with mother. He had not yet drug tested, had failed to show for tests on August 14 and September 4, and was difficult to work with. Father said he was working full-time, and if Kendall was placed with him she would stay with paternal grandfather, although father did not know the name of the paternal grandfather's wife or his address, and appeared not to have spoken with paternal grandfather regarding this plan. "DCFS has concerns about the moral character of father. He appears irresponsible and it is questionable if he can care for a newborn child. Father has much anger and did not even want to complete the interview regarding caring for his daughter and having visits. He has not shown the Department to be stable and dependable." Father stated he did not think Kendall was his child and wanted a paternity test, but later stated he had been saving money throughout the pregnancy to care for the baby. Father accused mother of lying, but "DCFS has found mother truthful." DCFS had yet to see his residence although father had been offered three visit times and had been told that a home visit was necessary. "There have been times father's erratic behavior appeared he may be under the influence." Father had called the police to report that Kendall's cheeks looked swollen, but when the officers checked on the baby her cheeks did not appear swollen and everything seemed fine.

DCFS did not believe father would cooperate with family reunification services as he had not complied with any DCFS requests (such as, returning telephone calls, seeing social worker and dependency investigator, random testing for drugs and alcohol) and had not asked to see Kendall. DCFS recommended monitored visitation.

Father came to DCFS offices for an interview on October 10. He was difficult and uncooperative, accusing DCFS of "constant harassment to test" and attempts to incriminate him. He stated he did not trust mother, who lied and used synthetic urine in her drug tests; "[p]eople say she still smokes weed." Although he had a history of using alcohol and experimented with drugs as a teenager, "I was sober and helped her get out of that world." Father stopped cooperating and the defense investigator ended the interview, reminding father the court had ordered him to participate in parenting classes, drug testing, and counseling. In a lengthy follow-up email, father accused DCFS of being unprepared for the interview, stated, "I AM NOT AN ALCOHOLIC," and denied he had been convicted of corporal punishment of a spouse. Mother was "holding [Kendall] hostage from me," allowing him only two visits in the hospital. Mother had shown up at his house and loitered outside, had a criminal background, and at one point during the pregnancy sent him text messages threatening to kill herself and the child, which a mutual friend had reported to police. Kendall's cheeks had looked swollen in photographs mother had sent him. "It seems like I'm not allowed any information on my own child yet I'm allegedly neglecting her, how ironic."

DCFS advised father how to arrange visits with Kendall, but instead he showed up at the office when the dependency investigator was not available. Father called later that day to say all the cases against him were closed, and that mother lied when she said the baby's cheeks were all right.

DCFS did not recommend placement with father, instead recommending family reunification, ongoing random drug and alcohol testing, drug treatment if necessary, individual counseling with anger management, and parenting classes. Kendall should remain placed in the home of mother's aunt and uncle, where mother should be allowed

to live until she could enter an inpatient drug program, and DCFS recommended discretion to liberalize visitation between Kendall and mother and father.

A letter from Western Pacific reported that mother had completed the narcotic replacement treatment program, had tested negative for illegal substances throughout, and "had a great attitude and [was] looking forward to life in a positive way." Mother had been accepted into a six-month outpatient program. Mother had attended six consecutive group parenting education classes and showed a willingness to learn.

On October 21, the court continued the disposition hearing. Mother's counsel requested that in the interim, Kendall be released to mother, who "has been extremely compliant with the Department from the get go." Because mother was sober, she was having trouble getting an inpatient program but was on a wait list, meanwhile living with her aunt and uncle. Mother had begun her work on sobriety before DCFS involvement, and would comply with any court conditions.

Father's counsel stated that father had concerns about mother's progress and opposed release to her, but he would agree to mother continuing to live with the current caregivers. Father wanted Kendall released to him. Contrary to the DCFS report, he had visited Kendall a few times with the caregivers as monitors. Father had a "different version" of the facts in the report, stating he was "frustrated" by his inability to set up appointments and had shown up to DCFS as directed but no one was there. Father requested the current order continue, with discretion to release Kendall to him, an assessment of the paternal grandfather and wife as his visitation monitors, and a written visitation schedule.

Kendall's counsel asked for release to mother (who had been testing clean well before DCFS involvement) in the home of maternal aunt and uncle, and recommended monitored visitation for father. Counsel for DCFS opposed a "premature" release to mother, whose sobriety was recent, and had a positive test for marijuana, a long history of drug use, and had failed to follow the criminal court orders.

The court ordered Kendall released to mother, who was doing everything she could, with family maintenance services in the home of maternal aunt and uncle; she was

to actively try to get into an inpatient program. Father was to be assessed for liberalization and for release "once he is testing clean" and DCFS was ordered to assess paternal grandparents as visitation monitors. As to both parents, DCFS was to consider the possibility of a section 301 contract[2] for informal supervision.

DCFS submitted a last-minute information on December 4 2014 recommending that Kendall remain with mother but opposing informal supervision given mother's heroin use and history of drug use. Although mother was compliant, testing clean, and cooperative with DCFS, she had been in treatment for only two months. "Father is not in compliance with the case plan and not drug testing." DCFS wanted to ensure that both parents successfully complete their case plan to provide appropriate care for Kendall.

**Adjudication hearing December 18, 2014**

Mother and father were present, but did not testify. The court admitted into evidence a letter stating that mother had completed 12 of a minimum 16 parenting classes; a progress report from her drug treatment program stating that she had attended sessions and tested negative since beginning on October 14, with "exceptional attitude" and "outstanding progress;" an attendance sheet for many NA meetings; and a letter from a friend and "professional in the field of addiction treatment" stating that mother had become a completely different woman when Kendall was born. Father submitted evidence that on the day of the hearing, he had enrolled in a 52-week anger management class; four days earlier, he began a four-hour parenting class; and a certificate of attendance for a superior court online course, "Parenting After Separation."

Father's counsel argued that the court should dismiss the allegations against him, as his DUI convictions were in 2009 and there was no evidence that father currently used alcohol. Father's position was that mother kept the baby from him and he had monitored visitation, so there was no current risk. His failure to test for DCFS was not evidence that he was using alcohol. Mother's counsel also argued for dismissal, as mother stopped

---

[2] Sections 301 and 360, subdivision (b) allow DCFS to undertake a voluntary program of supervision of a child for a limited period of time, without adjudicating the child a dependent.

10

using heroin as soon as she found out she was pregnant and did the responsible thing by getting into a methadone program on her own. She had tested negative since January and had been "nothing but compliant." Mother disputed the August positive result for marijuana, which in any event showed low levels; she also had to do an outpatient program for the criminal court. "I don't believe there's any nexus in this case to mother's history of substance abuse prior to the birth of this child when she got herself clean, and . . . since her birth . . . has been testing clean." As for father, mother did have concerns but she was capable of protecting the child with family court orders before he could have unmonitored visitation.

Kendall's counsel joined mother's and father's counsel in requesting dismissal, "more so for the mother." Mother could go to family law court to deal with custody issues. There was no nexus between mother's heroin use and a current risk to Kendall. Her methadone use while pregnant also did not pose a current risk. Mother had been completely compliant and Kendall was "perfectly happy and healthy" in her care. The spousal abuse count as to father should be dismissed, and although he did seem to have "an unresolved history with alcohol abuse," the court should not take jurisdiction on that basis as mother could work out custody issues in family court.

Counsel for DCFS argued that mother was still resolving her longstanding drug abuse issues, and was not in compliance with criminal court orders when the petition was filed. She had tested positive for marijuana, consistent with father's statement that she smoked marijuana during her pregnancy. Father had outstanding issues that made it "very clear" he posed a risk to Kendall, given mother's statement that he had used methamphetamine for two years, drank, and smoked weed, and his behavior with the social workers showed anger issues and a "complete lack of cooperation."

The court sustained the allegation against mother: "The mother has the history of substance abuse, and heroin is definitely a major concern. And this history of substance abuse and/or addiction and the ongoing use of marijuana up until the birth of the child definitely discusses her judgment issues."

11

The court sustained the allegation that father had "unresolved issues and a history of alcohol abuse" (including DUI's in 2009) and failed to test, and that his use and abuse of alcohol put Kendall at risk. The 2013 conviction for loud and unreasonable noise made it appear that he "has some alcohol issues that he has never proven that he's resolved, plus he's been given a chance by [DCFS] to test." The court commented: "It kind of seems to be underpled in light of another arrest in 2013 with charges of alcohol use and plea bargaining to not disorderly conduct, but the like." Noting that father had not been convicted for spousal battery but pleaded to other charges, the court dismissed the spousal abuse allegation against father.

The court declared Kendall a dependent child, removing her from father's custody and placing her in the home of mother. The court ordered family maintenance services for mother, who was to attend and complete a full drug and alcohol program with aftercare, weekly on-demand testing, parenting education, and individual counseling.

The court ordered DCFS to provide enhancement services to father, and ordered him to submit to weekly, random, and on-demand testing for drugs and alcohol; if he missed any tests, he was ordered to complete a full drug and alcohol rehabilitation program with testing. Father was also to complete parenting education, individual counseling, and anger therapy if the individual therapist recommended it. Father's visitation was to be monitored by someone other than mother, and DCFS had discretion to liberalize. The court also ordered DCFS to facilitate visitation with paternal grandparents, who would monitor father's visits with Kendall.

Mother and father filed timely appeals.

## DISCUSSION

Mother and father argue that the trial court's finding of jurisdiction over Kendall as to each of them was not supported by substantial evidence.

Jurisdiction under section 300, subdivision (b) is appropriate where "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child . . . or by the inability of the parent or guardian

to provide regular care for the child due to the parent's or guardian's . . . substance abuse."  The substantial risk of physical harm must exist at the time of the jurisdictional hearing:  "While evidence of past conduct may be probative of current conditions, the question under section 300 is whether circumstances *at the time of the hearing* subject the minor to the defined risk of harm."  (*In re Rocco M.* (1991) 1 Cal.App.4th 814, 824.)

On appeal from a finding of dependency jurisdiction, "[w]e review the record to determine whether there is any substantial evidence to support the juvenile court's conclusions, and we resolve all conflicts and make all reasonable inferences from the evidence to uphold the court's orders, if possible.  [Citation.]"  (*In re David M.* (2005) 134 Cal.App.4th 822, 828.)  We remain mindful, however, that substantial evidence is not synonymous with any evidence; it must be such that a reasonable mind would accept it as adequate to support a conclusion.  (*In re Jerry M.* (1997) 59 Cal.App.4th 289, 298.) "'A decision supported by a mere scintilla of evidence need not be affirmed on appeal. [Citation.]  Furthermore, "[w]hile substantial evidence may consist of inferences, such inferences must be 'a product of logic and reason' and 'must rest on the evidence' [citation]; inferences that are the result of mere speculation or conjecture cannot support a finding [citations]."  [Citation.]  "The ultimate test is whether it is reasonable for a trier of fact to make the ruling in question in light of the whole record."  [Citation.]'"  (*In re David M.*, at p. 828, italics omitted.)

**Mother**

The allegation under section 300, subdivision (b) sustained against mother stated: "[M]other . . . has a history of illicit drug abuse and is a current abuser of heroin and marijuana.  The child is a newborn and requires constant care and supervision.  The mother's drug abuse hinders the mother's ability to provide care and supervision of the child.  The mother used heroin and methadone during her pregnancy with the child, resulting in the child requiring methadone treatment since the child's birth.  On 8/13/2014, the mother had a positive toxicology screen for marijuana.  The mother has a criminal conviction of Possession of Narcotic Controlled Substance and noncompliance with her court ordered drug treatment program.  The mother's drug use endangers the

13

child's physical health and safety and places the child at risk of physical harm and danger."

Mother does not dispute the allegation's description of her drug abuse, Kendall's methadone dependence at birth, Mother's positive test for marijuana after Kendall's birth, and Mother's noncompliance with criminal court orders. She argues that at the time of the hearing in December 2014, circumstances had changed, she no longer had a substance abuse problem, and no evidence supported the court's conclusion that then five-month-old Kendall "require[d] protection from a *current* risk of 'serious physical harm . . . .'" (*In re J.N.* (2010) 181 Cal.App.4th 1010, 1024.) We disagree.

"[W]ithout more, the mere usage of drugs by a parent is not a sufficient basis on which dependency jurisdiction can be found." (*In re Drake M.* (2012) 211 Cal.App.4th 754, 764; *In re Destiny S.* (2012) 210 Cal.App.4th 999, 1003.) At issue here is not mere *use* of a substance, but substance *abuse*, as it is undisputed mother's two-year heroin addiction until sometime into her pregnancy with Kendall constituted substance abuse. When there is substantial evidence of substance abuse "it does not always follow that such a finding means that the parent or guardian at issue is unable to provide regular care resulting in a substantial risk of physical harm to the child. The trial court is in the best position to determine the degree to which a child is at risk based on an assessment of all the relevant factors in each case." (*In re Drake M.*, at p. 776.) Nevertheless, risk does not always require an "'*identified, specific hazard* in the child's environment . . . . [Citations.] . . . [When] children [are] of such tender years that the absence of adequate supervision and care poses an inherent risk to their physical health and safety. [Citations.]' [Citation.] . . . the finding of substance abuse is prima facie evidence of the inability of a parent or guardian to provide regular care resulting in a substantial risk of physical harm." (*Id.* at pp. 766–767, quoting *In re Rocco M.*, *supra*, 1 Cal.App.4th at p. 824.) At five months, Kendall was far from being "'old enough to avoid the kinds of physical dangers which make infancy an inherently hazardous period of life.'" (*In re Destiny S.*, *supra*, 210 Cal.App.4th at p. 1004.)

14

Mother argues that she was no longer abusing drugs at the time of the December hearing, and there was therefore no evidence she had a current substance abuse problem under *In re Drake M.*, *supra*, 211 Cal.App.4th at p. 766, which adopted a definition of substance abuse based on the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders. We note, however, that there was evidence mother had used heroin within a 12-month period (during which she had also had a criminal case reinstated for lack of compliance with a drug diversion program), and she had been arrested on outstanding warrants shortly before Kendall's birth, thus meeting the definition adopted in that case. Under the more flexible definition described by *In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1218, the trial court also could reasonably conclude mother's use of marijuana three months before Kendall's birth and shortly thereafter demonstrated the continuing nature of her struggle with substance abuse and her accompanying poor judgment.

The trial court assessed the risk posed to five-month-old Kendall by mother's recent substance abuse, and in light of the entire record, its finding of jurisdiction was reasonable. Mother began using drugs at 13. She abused heroin for two years and stopped using when she learned she was pregnant with Kendall. Some months into her pregnancy, mother began methadone treatment, which continued through Kendall's birth in July 2014 until October 2, 2014. Mother tested positive for marijuana in April 2014 while in methadone treatment, three months before Kendall was born. Mother was arrested twice on a warrant for drug possession in the month of Kendall's birth. Kendall was born dependent on methadone and required doses of methadone to ease her withdrawal from the drug.[3] Mother again tested positive for marijuana in August 2014

---

[3] We need not decide whether Kendall's dependence on methadone at birth alone justified jurisdiction, although DCFS argues, "The fact that [an infant] was diagnosed as being born under the influence of a dangerous drug is legally sufficient for the juvenile court to exercise jurisdiction." (*In re Troy D.* (1989) 215 Cal.App.3d 889, 897.) That case involved an infant born positive for amphetamines and opiates, and an allegation sustained under an earlier version of section 300, subdivision (a). (*Id*. at p. 895.) Further,

15

when Kendall was less than a month old. Although mother denied she used marijuana in August 2014, we resolve this conflict in favor of the court's order. Further, at the time of the adjudication hearing, mother had been off methadone for two and a half months, and had been in her outpatient program only two months while awaiting placement in an inpatient program. We recognize that mother had made significant progress, but given Kendall's pronounced vulnerability as a five-month-old infant, substantial evidence supported the trial court's finding that a risk of harm still existed at the time of the hearing and jurisdiction was proper under section 300, subdivision (b). "'In dependency proceedings, a trial court's determination will not be disturbed unless it exceeds the bounds of reason.'" (*In re E.B.* (2010) 184 Cal.App.4th 568, 574.)

### Father

As to father's appeal, "a jurisdictional finding against one parent is good against both. More accurately, the minor is a dependent if the actions of either parent bring her within one of the statutory definitions of a dependent. [Citations.] This accords with the purpose of a dependency proceeding, which is to protect the child, rather than prosecute the parent." (*In re Alysha S.* (1996) 51 Cal.App.4th 393, 397.) Father does not challenge the placement of Kendall with mother in the home of maternal aunt and uncle, and so his custody rights are not affected. (See *In re J.K.* (2009) 174 Cal.App.4th 1426, 1431–1432.) Nevertheless, father argues that the jurisdiction findings as to him could adversely affect a future dependency or family law proceeding in which he might be involved. "Here, the outcome of this appeal is the difference between father's being an 'offending' parent versus a 'non-offending' parent. Such a distinction may have far-reaching implications with respect to future dependency proceedings in this case and father's parental rights. Thus, although dependency jurisdiction over [the child] will remain in place because the findings based on mother's conduct are unchallenged, we will review father's appeal on the merits." (*In re Drake M.*, *supra*, 211 Cal.App.4th at p. 763.)

---

the trial court did not base its jurisdictional finding under section 300, subdivision (b) on Kendall's methadone dependence at birth.

The allegation under section 300, subdivision (b) sustained against father was as follows: "[F]ather . . . has unresolved issues and a history of alcohol abuse. On 9/24/2009 father . . . was convicted of driving under the influence of alcohol. On 11/20/2009 father . . . was convicted of driving under the influence of alcohol. Father has failed to test for the [DCFS]. Such use and abuse of alcohol by the father endangers the child's physical health and safety and places the child at risk of physical harm and damage." The court referred to father's DUI arrests in 2009 and his arrest in 2013, and mentioned father's refusal to test, ordering him to test weekly on demand. As to father's "unresolved issues," the court ordered father to complete anger therapy if recommended by his individual therapist.

Father argues that there was no evidence that at the time of the hearing he posed a current risk of harm to Kendall, as his 2009 convictions for DUI were too old; his plea in 2013 was only to unreasonable noise; and his failure to test was insufficient to establish that he had a current problem with alcohol. The evidence included mother's statements that father used drugs with her, had used methamphetamine for the last two years, and also drank and smoked marijuana. She described father's anger issues, aggressiveness, and paranoia, and a self-reported diagnosis of schizophrenia. During the four months after the detention hearing and the two months following the filing of the allegation father refused to test for drugs or alcohol as ordered by the court. DCFS reported that he failed to show for scheduled meetings or respond to phone calls, was angry and aggressive toward DCFS, and did not arrange to visit Kendall after she left the hospital. His email made allegations of injuries to Kendall which were contradicted by police reports that no such injuries were found. Father accused mother of lying, harassing him, and faking her clean drug tests. Father had a "different version" of the facts than DCFS, claiming he had visited Kendall, that DCFS was not there when father showed up at the office, and DCFS's report was inaccurate. In addition to the 2009 DUI's, there was evidence father had been arrested in 2013 for disorderly conduct: intoxicated drugs/alcohol and a DUI warrant, and pleaded to loud/unreasonable noise. He never tested, and did not begin to

17

comply with any other aspects of the case plan until just before the time of the jurisdiction/disposition hearing.

Substantial evidence supported a finding that father posed a current risk of substantial harm to five-month-old Kendall. Mother reported his alcohol and drug abuse. His two DUI convictions in 2009 and his 2013 arrest on disorderly conduct: intoxicated drugs/alcohol and a DUI warrant, specifically mentioned by the trial court, also are evidence of a substance abuse problem continuing into the year before Kendall's birth. (*In re Christopher H.* (1996) 50 Cal.App.4th 1001, 1007 [three DUI arrests over four years demonstrate substance abuse problem].) Father denied any alcoholism or drug abuse, but credibility determinations are the province of the trial court, which was entitled to find mother credible, especially given father's refusal to test as ordered by the trial court. DCFS said father did not visit Kendall, although father claimed he did; we resolve that conflict in the evidence in favor of the court's order. All this, coupled with father's failure to test, is evidence a reasonable mind would accept as adequate to support sustaining the allegation.

Once again, we emphasize that at the time of the jurisdiction hearing Kendall was a five-month-old who had been born dependent on methadone and required daily doses of the drug. Father's history of driving while intoxicated was evidence of substance abuse. Throughout the case he showed anger and aggression. He failed to comply with the case plan or to visit Kendall, and never tested as ordered for drugs or alcohol. Given Kendall's tender years—in fact, tender months—this constitutes substantial evidence that at the time of the hearing father could not provide adequate supervision and care of infant Kendall's physical health and safety, and supports the finding of jurisdiction under section 300, subdivision (b).

18

**DISPOSITION**

The order is affirmed.

NOT TO BE PUBLISHED.


                            JOHNSON, J.


We concur:


CHANEY, Acting P. J.


LUI, J.

19